## S. L. Cooper, Appellee, v. Palais Royal Theatre Company et al., Defendants, on appeal of Nelson Thomasson, Appellant.

### Gen. No. 31,124.

1. MECHANICS' LIENS—*when lumber intended for use in making forms for concrete work not "delivered to owner or his agent" within meaning of Cahill's St. ch. 42, ¶ 7.* Although a contractor for the erection of a building at a certain street corner, with the permission of an agent of the owner of the premises where the structure was to be erected, piled upon an opposite corner of that intersection, owned by the same party, secondhand lumber which he intended to use in the construction of concrete forms in the erection of that building, and employed men to put such lumber into condition for the intended use by drawing out nails, etc., such lumber was not furnished and delivered to the owner or his agent so as to make its value and the cost of the labor thereon the subject of a mechanic's lien, notwithstanding Cahill's St. ch. 42, ¶ 7.

2. MECHANICS' LIENS—*sufficiency of evidence to show owner of premises "knowingly permitted" delivery of material to contractor making improvements thereon.* Evidence in a proceeding to establish a mechanic's lien held to show that the owner of the premises whereon the work was done and the material was furnished and delivered, knowingly permitted such work and delivery pursuant to a contract between such contractor and one with whom such owner had negotiated with a view to a sale of the premises.

3. MECHANICS' LIENS—*right to lien for reasonable worth of material furnished for use of one whom owner "knowingly permits" to make improvement, where contract abandoned because of other party's default.* Under Cahill's St. ch. 42, ¶ 4, a contractor who has furnished labor and material for an improvement upon property under a contract with one whom the actual owner of the property has knowingly permitted to make such improvement, may have a lien for the reasonable worth of such labor and material although he does not complete the contract because of the failure of the other party thereto to perform on his part.

4. MECHANICS' LIENS—*validity of statute authorizing lien for reasonable worth of material furnished on uncompleted contract, where construed as against owner knowingly permitting delivery thereof to one making improvement.* The owner of premises against which a lien is decreed under Cahill's St. ch. 42, ¶ 7, is not deprived of his property without his consent, or without due

process of law, although the establishment of such lien results from a construction of such provision of the statute such that it will support a claim of lien for the benefit of a contractor furnishing labor and material under a contract with one whom the real owner of the premises has knowingly permitted to make the improvement although such contractor has no contract signed by the real owner.

5. APPEAL AND ERROR—*affirmance of decree for mechanic's lien as against claim of excessiveness, where appellant omits to bring up for review all exhibits pertinent to issue.* A decree awarding a mechanic's lien will not be disturbed upon a claim that it is excessive in amount where as far as the record shows the items allowed were proper subjects for a lien, and the appellant has failed to bring up all the pertinent exhibits offered in evidence in the court below.

THOMSON, J., specially concurring.

Appeal by defendant from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding. Heard in the third division of this court for the first district at the April term, 1925. Affirmed in part and reversed in part. Opinion filed October 13, 1926. Rehearing denied October 27, 1926.

GRANVILLE W. BROWNING, for appellant.

A. S. and E. W. FROEHLICH, for appellee, Complete Artificial Stone Company; EDMUND W. FROEHLICH, of counsel.

LITSINGER, HEALY & REID, for appellee, S. L. COOPER.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

On July 29, 1921, S. L. Cooper, as complainant, filed a bill of complaint in the circuit court, seeking to obtain a mechanic's lien upon certain real estate of Nelson Thomasson, Sr., the defendant. A number of others were made parties defendant. On March 8, 1922, Thomasson, Sr., filed an answer, and later, a cross-bill. On March 15, 1922, the matter was referred to Master in Chancery Doyle. On June 9, 1922, leave was given to the Complete Artificial Stone Company

to file an intervening petition, and on the same date a petition and answer to the bill of complaint were filed. After various proceedings before the master and the chancellor in regard to the pleadings and the evidence, the master filed a report, recommending mechanics' liens in favor of both the complainant and the intervening petitioner; and on February 13, 1925, a decree was entered overruling exceptions to the master's report. The decree gave the complainant a lien in the sum of $8,355.09, with interest from July 20, 1921, making a total of $9,843; and gave the intervening petitioner a lien, inferior only to that of the complainant, in the sum of $11,815.90, with interest from June 22, 1920, making a total of $14,662.

As to the general situation and the relations of the parties, the evidence shows the following: The real estate in question was at the southeast corner of Ainslie and Kedzie Streets, in Chicago. It was owned by the defendant Thomasson, Sr. He, also, owned the real estate at the southwest corner of the same streets. Covering both properties, there was a mortgage outstanding, securing $25,000 of indebtedness.

Some time in the year 1920, one Schaeffer undertook the organization of the Palais Royal Theatre Company, with a view to building a theatre, and began negotiations looking towards the purchase of the property of Thomasson, at the southeast corner of Ainslie and Kedzie Streets. The company was incorporated by Thomasson, Jr. (so he testified). Schaeffer was president. The theory was that the building, including the ground, was to cost $750,000, and to finance the matter, there was to be a bond issue of $600,000. Bonds were never issued, although some interim certificates were sold. Thomasson, Jr., subscribed for one share of stock, as an incorporator, and was treasurer of the company for about 30 days, and signed some stock certificates. Schaeffer testified that the stock was all common stock, and that $100,000 of it was

kept for the promoters; that one-sixth of the stock was to go to Thomasson, Jr.

Thomasson, Sr., testified that his son, Thomasson, Jr., represented him about the property. In the fall of 1920, negotiations took place between Schaeffer and Thomasson, Sr., in regard to the purchase by the company of the property at the southeast corner of the streets above named. Schaeffer offered to pay off the mortgage of $25,000, and give Thomasson, Sr., and Jr., 49 per cent of the stock of the company. Thomasson, Jr., testified that his father said he was not interested in the stock; that they could give that to him, his son. The negotiations finally resulted in a so-called escrow agreement being deposited on September 20, 1920, signed by Thomasson, Sr., with the Chicago Title and Trust Company. The escrow agreement was an offer, in writing, by Thomasson, Sr., authorizing and directing the Chicago Title and Trust Company to deliver a deed to the property in question—which deed was deposited contemporaneously with the escrow agreement—"when there has been delivered to you a release of trust deed  *  *  * to the premises in question  *  *  *." In other words, Thomasson, Sr., offered to consummate a sale of the property, but only when the Palais Royal Theatre Company should pay off the incumbrance of $25,000, and certain taxes and instalments. Schaeffer tried to raise the necessary amount, approximately $25,000, but failed, and so the offer to sell was not accepted, and the deed of the property never delivered.

The Palais Royal Theatre Company—hereinafter called the Theatre Company—made in 1920, two contracts, among others, one with the Complete Artificial Stone Company,—hereinafter called the Stone Company,—and one, in September, 1920, with Cooper. The Stone Company was to put in the concrete foundations, and Cooper to build the theatre. The Stone Company began work on June 7, 1920, and finished its work on

June 22, 1920. The work and material of the Stone Company, the intervening petitioner, according to the testimony of its president Wahl, was worth $12,500. The decree—which is too meagerly set forth in the abstract of record—allowed, exclusive of interest, $11,815.90. Cooper, the complainant, began work on the premises in October, 1920. The last work he did was in July, 1921. The decree allowed him, exclusive of interest, $8,355.09.

Cooper, shortly after making his contract, went to work to put up the building. He testified that he agreed to erect a tower (to elevate material), complete all the chutes, to bring all his tools and lumber, and have everything prepared before any money was raised for a financing fund. He built the tower, which was about 100 feet high. The building was to be one of concrete, and the tower was to be used chiefly in carrying up prepared concrete for purposes of distribution. He took to the premises certain machinery, and certain lumber. Most of the lumber was not taken to the premises in question,—the southeast corner, on which a lien is claimed—but was delivered to, and piled on the premises at the southwest corner, which was also owned by Thomasson, Sr. Cooper testified that he did not know how much lumber he had on the southwest corner, but that he did pile up a lot of lumber there, and that he did not use it, and that at the time of the trial it was still there.

One Rosenzweig, Cooper's timekeeper, who checked in lumber that was delivered, and whom Cooper said he employed, testified that he worked there from October 5 to November 18, 1920; that he checked the material that came, and made a record of it, and kept the time of the laborers; that they helped unload the trucks of lumber; then piled it, and cleaned it and took nails out of it—that some of the lumber of the first delivery was put on the ground between the sidewalk and the curb, at the southeast corner, and was

used in the hoisting tower, and that all the 4 by 4 were put on the southwest corner, save some that were used in the hoisting tower. All the lumber was used lumber, he says, and had been used for forms in building another theatre; that the only lumber actually used was in building the hoisting tower; and that none of it was used on the premises in question for forms. He further testified that the lumber was hauled on trucks, carrying from 5 to 8 tons each; that the first load was piled on the street, beside the curb, and was later taken away and put on the southwest corner; that all the lumber was dirty, used lumber, and had nails in it. He testified, exhibiting 13 sheets with memoranda which he made at the time of the various transactions, that in all 13 truck loads of lumber were delivered, all of which was delivered to, and piled on the southwest corner, with the exception mentioned; that it was all delivered in October, 1920. He also testified to the amounts paid to the laborers who worked on the lumber which was piled on the southwest corner. Cooper testified that he piled the lumber on the southwest corner because there was no room on the southeast corner; that he did not know how much he had there; that Schaeffer told him that he had the right to pile it there; that the lumber was to be used in the construction of the building, and for forms and moulds to pour concrete in; that part of the lumber was used in making the hoisting tower; that what was not used in the hoisting tower was still piled upon the southwest corner. He further testified that the lumber was Georgia Pine, Grade No. 1, but was used lumber, taken from the Senate Theatre.

He further testified that he unloaded on the premises two concrete mixers, one steam hoist, a gasoline pump, double gauge hoisting engine, iron chutes, two-wheeled carts, 35 wheelbarrows, 80 wooden horses, three mortar boxes, 40 mortar boards, and some cables, and gave the rental value of the property so delivered.

Cooper further testified that he told Thomasson, Jr., he wanted permission to put the lumber on the southwest corner. Thomasson, Sr., said that he never gave anyone, and never was asked permission to pile lumber and machinery on the southwest corner and that he was never out at the premises except on Sundays, and was never there when men were working on the southeast corner. His son said he spoke to Cooper in October, 1920, and asked him if he, Cooper, was not bringing up an "awful" lot of stuff; that Cooper said, yes, he had just finished a theatre and had to have some place to put his stuff, and that he wanted to know if there was any objection to it being put on the southwest corner; that he, Thomasson, Jr., told him he had no objection to his putting his lumber on the southwest corner.

Schaeffer testified that he saw Thomasson, Sr., at the property on Sundays; Wahl, that he saw him there two or three times while the men were working, and talked with him; Glover, that he saw him there when the hoisting tower was being built, saw him talking with Schaeffer; Rosenzweig, that he saw him there in the early part of October, 1920, when the laborers were unloading lumber, and the carpenters were working on the hoisting tower, saw him twice just looking around; Nelson, that he saw him once or twice at the corner at the time the foundation was going in, in 1920. Cooper testified that a few months prior to the hearing, Thomasson, Sr., told him that he knew what was going on, on the premises, and that the work was being done by him, Cooper, and asked him, "How are you going to prove it?"

Owing to the inability of the Theatre Company to obtain money to finance the undertaking, and the consequent failure to pay Cooper what, if anything, was due him, some time after he had built the hoisting tower, he quit work. Cooper said that he did not take any of the lumber away that was piled on the south-

west corner, because it belonged to the Theatre Company.

. As the decree allowed Cooper $8,355.09, being the amount recommended by the master, less $883, for the hoisting tower, and as the $8,355.09 was made up—in addition to the item of $883—of the following items: $6,408.65 for lumber used on the premises; money paid to laborers, $1,969.62, and 10 per cent of the last two amounts, the question arises at the outset whether the evidence sufficiently shows that the lumber was delivered as required by section 7 of the Lien Act [Cahill's St. ch. 42, ¶ 7]. In answering that question, we think a consideration of what the evidence shows leads irresistibly to the conclusion that no such delivery took place. The testimony of Cooper, Schaeffer and Thomasson, Jr., is not enough. Secondhand lumber forms piled across the street on property entirely disconnected with the actual building site, and Thomasson, Jr., testifying that he told Cooper he had no objection to his piling lumber there, does not make out a case of delivery. The bill of complaint does not even mention the real estate at the southwest corner, where the lumber was delivered.

The Mechanic's Lien Act of this State being in derogation of the common law, it has been held by the Supreme Court that it must be strictly construed. *Provost v. Shirk,* 223 Ill. 468. The statute itself provides, section 39 [Cahill's St. ch. 82, ¶ 39]: "This act is and shall be liberally construed as a remedial act." Prior to July 1, 1913, when the Mechanic's Lien Act was revised, it was the law that a lien for materials was limited to the extent of their actual use in the construction of the building, and in *Rittenhouse & Embree Co. v. F. E. Brown & Co.,* 254 Ill. 549, decided in 1912, the court held that lumber used in making forms in which concrete was poured was not within the statute, as they did not become a part of the completed con-

struction. But, as the court said in *Hoier v. Kaplan,* 313 Ill. 448:

"In 1913 the act was amended by including within its scope 'forms or formwork used in the process of construction where cement, concrete or like material is used.' This amendment authorized a lien for such forms when used in the process of construction in the manner specified, even though they did not become a part of the completed building or improvement.
\*   \*   \*

"Section 7 of the Mechanic's Lien act, as amended in 1913, permits the enforcement of a lien, within certain limitations, if 'it is shown that such material was delivered either to said owner or his agent for such building or improvement, to be used in said building or improvement, or at the place where said building or improvement was being constructed, for the purpose of being used in construction or for the purpose of being employed in the process of construction as a means for assisting in the erection of the building for improvement in what is commonly termed forms or formwork where concrete, cement or like material is used, in whole or in part.' The words 'to be used in said building or improvement,' and 'for the purpose of being used in construction,' have a more direct and immediate relation to the improvement than do the words 'for the purpose of being employed in the process of construction as a means for assisting in the erection of the building,' etc. 'Used in said building or improvement' and 'used in construction' denote use as a part of the construction so that the material becomes a part of the completed structure. (*Rittenhouse & Embree Co. v. Brown & Co., supra.*) The words 'used in the process of construction' were not in the act before the amendment of 1913, and are specifically limited to 'forms or formwork where concrete, cement or like material is used.' These words do not enlarge the act to cover any other means employed

in the process of construction. Labor indirectly employed, unless it be upon forms put to the specified use, will not give rise to a lien.''

As the lumber was all placed on the southwest corner, and workmen merely worked on it cleaning and scraping it, and pulling nails out of it, and all of the lumber was left there in that state by Cooper, we are of the opinion that, although it was the intention of Cooper ultimately to use the lumber for the making of forms to be used in the construction of the concrete work of the prospective building, it cannot be said that the lumber in question was so furnished and delivered as to make it the subject of a mechanic's lien.

As to the claim of the Artificial Stone Company: The property at the southeast corner having been excavated, a contract was made on June 3, 1922, between the Theatre Company and the Stone Company by which the Stone Company undertook to furnish all the labor and materials for the construction of the concrete foundations, according to certain plans, and to do certain excavating, for $19,293, 85 per cent to be paid during the progress of the work, the first payment to be made 10 days after work was begun, and a payment each 10 days thereafter. The Stone Company began the work and proceeded to dig the trenches, lay the footings and build the concrete foundations.

Wahl, the president of the Stone Company, attended the work daily. He testified that he saw Thomasson, Jr., there every morning and saw Thomasson, Sr., there two or three times; that the first time he saw Thomasson, Sr., there, the latter said, ''You are putting in some pretty heavy foundations there''; and he, Wahl, answered, ''Yes,'' and that Thomasson, Sr., then said it would be a good proposition as a theatre. Schaeffer, upon request for payment, as the work progressed, gave Wahl, for the Stone Company, two checks, but they were returned, ''Not sufficient funds.''

No actual payment was ever made on the contract. After the return of the second check, Wahl notified Schaeffer that unless the Stone Company was paid as required by the contract, the work would be stopped. Later, it filed its intervening petition, asking for a mechanic's lien in the sum of $12,500. The master recommended, and the chancellor decreed a mechanic's lien in favor of the Stone Company in the sum of $11,895.90. That amount was made up of the following items: $10,497.90 for 14,997 cubic feet of concrete work at 70 cents per cubic foot; $750 for 500 cubic yards of trench excavation at $1.50 per cubic yard; and $648 for labor in constructing forms for concrete work.

It is urged for Thomasson, Sr., that it was not shown that Thomasson, Sr., knowingly permitted the work to be done. We think otherwise. Considerable of the evidence on that subject that we have considered in discussing the claim of Cooper is pertinent, and all tends strongly to show that Thomasson, Sr., did, with full knowledge, permit the work and materials to be furnished by the Stone Company, and to the premises owned by him at the southeast corner. It is urged that Wahl knew that Schaeffer had no money; that he knew that one Erickson, a contractor, had been offered the contract with a large profit, but had declined to take it, on the ground that there was no money in sight; that he must have known that there was no contract between the Theatre Company and Thomasson, Sr.; and that the Stone Company proceeded heedlessly, without a valid contract. None of those objections, or all taken together, are sufficient. The Theatre Company was under way, supposedly as a going concern, even though it might be hard up for money. The Thomassons, both father and son, knew the Stone Company was at work furnishing materials and labor for the Theatre Company, and by no overt act disputed the right of the Stone Company,

or the Theatre Company, to go on, and put in a large and costly amount of labor and materials. In such a situation, we think an estoppel arose, such as the Lien Act contemplates, and as gives a right by the use of the words, "knowingly permitting." *Wertz v. Mulloy,* 144 Ill. App. 329.

It is urged that the Stone Company is not entitled to a lien because it did not complete its work, and that there may be a lien for unfinished work only where the "owner of the land" signs a contract. With that we do not agree. In our judgment, the meaning of the word "owner" as used in section 4 of the act [Cahill's St. ch. 82, ¶ 4] is the same as when used in section 1 [Cahill's St. ch. 82, ¶ 1]. *Hacken v. Isenberg,* 288 Ill. 589. In the latter case, in passing upon the meaning of the word "owner" in section 30 of the act [Cahill's St. ch. 82, ¶ 30], the court said: "The words 'the owner' in section 30 have the same meaning as they do in section 1, and have reference to anyone having such an estate, right or interest as aforesaid, whether his estate, right or interest be one in fee, for life, for years or for any other interest." As, therefore, in our judgment, the Theatre Company was "an owner" under section 1, it was likewise "an owner" under section 4. In our judgment, as far as the statute is concerned, there is no distinction between an owner who authorizes, and one who knowingly permits. Reading section 4 in conjunction with the rest of the act, we cannot believe that it was intended by the legislature to affect or impair in any way any lien arising by reason of section 1. Section 4 seems to have been enacted so as to extend and broaden the rights of a contractor and improve his remedy by way of a mechanic's lien, in the event of any breach of any kind by the one with whom he has his contract, even though the one with whom he has his contract is an owner only in the sense of being one whom the actual owner has knowingly permitted to make an improvement. In our

196    APPELLATE COURTS OF ILLINOIS

Cooper v. Palais Royal Theatre Co. et al., 242 Ill. App. 184.

opinion the act permits a lien for uncompleted work, although the owner of the land as such owner signed no contract, if he may be considered as having knowingly permitted a third person to do so, and work and materials are furnished thereunder.

It is further contended that if section 4 be construed favorably to the claimant here, it results in depriving the owner of certain property rights without his consent. With that we do not agree; having had knowledge and permitted the thing to be done in part or in whole, he is for that reason properly chargeable with notice.

It is urged that the decree deprives the defendant of his property without due process of law; that there is no provision of the statute giving a lien for unfinished work except where the contractor has a contract with "the owner of the land"; that the Stone Company had no such contract, and therefore the decree is not based on any valid right. That is untenable, and what we have said above shows why.

The amount of the decree in favor of the Stone Company is criticized. It must be borne in mind that the amount of the Stone Company's claim is not to be figured upon the basis of the contract itself, but upon a *quantum meruit*, that is, the value of the work and material furnished. *Fehr Const. Co. v. Postl System of Health Bldg.*, 288 Ill. 634. As far as the record shows, all the work and material considered in arriving at the amount of the decree were part of those contracted for and were a proper subject—considering the nature of the contract and what was done under it—of a mechanic's lien. *City of Salem v. Lane & Bodley Co.*, 189 Ill. 593. Further, in view of the fact that the defendant failed to bring up all the pertinent exhibits that were offered in evidence, we are not justified in modifying the decree as to the amount of the lien.

Cooper v. Palais Royal Theatre Co. et al., 242 Ill. App. 184.

As to the contentions of fraud and bolstering up the claim of the Stone Company, the evidence shows such charges to be negligible.

The decree in favor of S. L. Cooper will be reversed, and the decree in favor of the Complete Artificial Stone Company will be affirmed.

*Affirmed in part and reversed in part.*

O'CONNOR, J., concurs.

MR. JUSTICE THOMSON, specially concurring: I concur in the decision of this case, but I do not agree with all that is said in the foregoing opinion, with respect to the right of S. L. Cooper to a lien. In the foregoing opinion the part of the decree of the circuit court giving Cooper a lien is reversed not only on the ground that the material for which he asked a lien, as well as the labor put upon it, was not used in the construction of the Palais Royal Theatre; but also apparently upon the ground that the material for which Cooper asked a lien was not delivered physically to the real estate or lot upon which the theatre was being built; but upon a lot belonging to the same owner, on the opposite side of the street. With the latter proposition I do not agree. In my opinion the fact that the excavations for the theatre foundation took up practically the entire lot upon which it was being constructed, and that the lumber which Cooper, who had the contract for the superstructure, intended to use for the building of concrete forms, for convenience was piled across the street—on other property belonging to this defendant—with the knowledge and acquiescence of his agent, is quite immaterial. I agree with the holding that the trial court erred in granting Cooper a lien, but solely on the ground that the language of the Mechanic's Lien Act, as interpreted in *Hoier v. Kaplan*, 313 Ill. 448, does not cover material hauled to a building site by a contractor for the purpose of use in the construction of forms for concrete

work, nor does it cover labor in cleaning such lumber where it has previously been used for a similar purpose, and in preparing it for use on the job in question, where it is shown as it is in the case at bar, that, in fact, such lumber was never so used, but that shortly after the lumber was hauled to the building site, the erection of the building was abandoned.